UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DEVEN MACNAIR | * | CIVIL ACTION |
| VERSUS | * | NO. 23-761 |
| CHUBB EUROPEAN GROUP SE | * | SECTION "T" (2) |

## ORDER AND REASONS

Pending before me is Defendant Chubb European Group SE's Motion to Disqualify Counsel. ECF No. 145. Plaintiff Deven MacNair filed an Opposition Memorandum and Chubb filed a Reply Memorandum. ECF Nos. 155, 156. The Court heard arguments on March 12, 2025. ECF No. 162. At the conclusion of the hearing, the Court took the matters under submission. *Id.*

Having considered the record, evidence, the submissions and arguments of counsel, the applicable law, Defendant's Motion to Disqualify Counsel is GRANTED for the reasons stated herein.

## I.    BACKGROUND

### A.    Factual History

Plaintiff Deven MacNair owned a duplex located at 526-528 Belleville Street, New Orleans, living in one side and renting out the other. ECF No. 1-1 ¶¶ 6, 10. Defendant Chubb European Group SE insured the property. ECF No. 61-31. On August 29, 2021, Hurricane Ida damaged the property. Shortly thereafter, Plaintiff submitted an insurance claim which was adjusted by Defendant's third-party administrator Minuteman Adjusters. ECF Nos. 1-1 ¶¶ 9, 13-14; 46-1 at 2. On September 17th, Defendant paid Plaintiff $7,228.27 based on its inspection. ECF Nos. 1-1 ¶ 23; 46-1 at 2. Disagreeing with that amount, Plaintiff contacted Minuteman on October 15th, during which Minuteman suggested she submit a contractor's estimate of additional damages for review, which Plaintiff agreed to do. ECF No. 46-9 at 131:14-132:5.

1

In May 2021, three months before Hurricane Ida, Plaintiff had engaged Dustin Fleiner of Trainque Group Construction ("TGC") to estimate the costs of converting her duplex into a single-family home. ECF Nos. 46-16 at 2 (¶¶ 4-7), 6-7; 61-21 ¶¶ 2-3. TGC does construction and renovation services, but not remediation/storm repairs. ECF No. 46-16 at 1 (¶¶ 2-3). When Plaintiff contacted Fleiner to discuss "insurance and renovation" and inspect the property, Fleiner explained his services and told Plaintiff that she needed mitigation services; he recommended Michael Benedic of 911 Restoration, LLC ("911") and Eco Energy & Solar Solutions, LLC ("Eco"). ECF No. 46-9 at 133:19-134:12; 46-16 at 3 (¶ 9), 8-12.

On October 29th, Kyle Diez, a 911 subcontractor and employee of Eco,[1] inspected Plaintiff's property and advised that the interior needed to be demolished. ECF Nos. 46-26 at 21:12-18; 46-9 at 237. Plaintiff executed an Assignment of Benefits dated October 29, 2021 ("AOB"), in favor of 911, assigning all insurance proceeds for services rendered. ECF No. 145-9. Diez referred Plaintiff to attorneys David Binegar and Tiffany Christian. ECF Nos. 46-26 at 22:7-20. Diez oversaw the demolition and prepared the scope of work. ECF No. 136-8 at 73:16-24.[2] Although no estimate was provided for the services, 911 proceeded to demolish the interior from December 2021 to March 2022. ECF Nos. 61-6 at 47:16-24; 159-2 at 8. Defendant did not receive notice before the demolition.[3]

---

[1] *See* ECF No. 136-8 at 22:18-25 (Benedic's August 9, 2024, deposition, stating Diez stopped working for his companies "within the last 60 days"), 73 (describing Diez's relation to the companies).

[2] *See also* ECF No. 61-6 at 13:2-14:10 (Diez stating he was the water mitigation supervisor, which entailed "[c]oming up with scopes of work," and that he was the only water mitigation supervisor for Plaintiff's job).

[3] Defendant requested an estimate or documents to support a reinspection. ECF No. 61-6 at 47. Plaintiff testified she never notified a claims handler about the demolition. ECF No. 46-9 at 184:3-15. She did not notify Minuteman in her email exchanges. *Id.* at 182:2-14. She called and "also had [Diez] calling." *Id.* at 180:3-23, 183:4-13. Diez testified Plaintiff had supporting documents and that he attempted to contact Defendant and Minuteman weekly from November 2021 to January 2022 from his work phone to request a reinspection of the property before the demolition. *See* ECF No. 61-6 at 26:8-13, 36-39, 45:7-15, 47-48. He did not attempt to email Minuteman. *Id.* at 48:18-49:24. The phone's number is registered to Ricks. ECF No. 136-9 at 233:16-234:8. Defendant stated at the hearing the phone records indicate Diez did not contact it at all, and in its motion, it states the administrator was not contacted either. ECF No. 145-1 a 16; 145-11 (phone records).

In the interim, on February 25, 2022, Fleiner completed TGC's $266,550 renovation estimate (the "Estimate") based on the pre-Ida architectural plans that Plaintiff had sent to him, and he emailed that Estimate to Plaintiff.  ECF Nos. 46-16 at 3-4 (¶¶ 10-13), 14; 136-4 at 89:10-25; *see* ECF No. 46-16 at 28-35.  On February 27th, Binegar submitted the Estimate to Minuteman as an estimate for "storm-related repairs."  ECF No. 46-12.  He also invoked the policy's appraisal provision and selected Chad Ricks as the independent appraiser.  *Id.*  Ricks owns a mitigation services company (Allsafe Restoration, LLC) and an appraisal and estimates company (Apex I&E Solutions), both of which do work for Benedic's companies,[4] and 911 engaged Apex to perform services for Plaintiff.  ECF Nos. 136-9 at 17:20-24, 25:1-15, 237:12-13; 136-8 at 17:10-18.[5]  Benedic decided Ricks would be the appraiser.  ECF No. 136-8 at 13:25-14:6.

Once Diez prepared the scope of work, he sent it and supporting documents to 911's "estimating" department (Benedic), and Diez, Benedic, and Ricks worked together to prepare what eventually would be 911's June 7, 2022, Invoice for $180.107.84 (the "Invoice").  *Id.* at 73:16-75:21; *see* ECF No. 153-3 at 20-48.[6]  Ricks received the documents a "couple of weeks" before he created the Invoice and submitted it to Defendant's appraiser on June 7th.  ECF No. 136-9 at 164:12-24, 165:18-166:16.  The appraiser requested documents from Ricks to support the quantity and scope because, at the May 19th joint inspection, the appraiser discovered that the demolition had already occurred.  *Id.* at 104:22-105:21, 111:5-112:10.  Defendant withdrew from the appraisal process because there was not sufficient information for a proper appraisal given that 911 had demolished the interior and the Invoice and other documents were dated after the demolition.  ECF No. 61-9.

---

[4] Ricks receives 30%-50% of his income from Eco.  ECF No. 136-9 at 33:6-24.
[5] Benedic describes Ricks's companies as contractors for 911's "estimating department."  ECF Nos. 136-8 at 79:12-16.
[6] Benedic quibbled about describing the Invoice as an invoice and rather described it as "an estimate," even though he acknowledged that the document was created "after the fact. You can't create [the document] beforehand, you know."  *Id.* at 75:7-21.

Plaintiff learned of the Invoice on September 21, 2022.  ECF No.46-7 at 26 (100:14-24).  The Invoice is what Plaintiff owes 911, though 911's total cost for its services is $11,131.13.  ECF No. 159-2 at 8; No. 136-8 at 136-37.  Benedic, Diez and Ricks have a financial interest in the job, with Diez receiving 3% to 10% of 911's gross profit for mitigation jobs as a commission[7] and Rick's appraisal company Apex's payment being contingent on 911's receipt of payment.[8]

On January 9, 2023, Plaintiff filed suit against Defendant, alleging breach of contract and bad faith insurance practices.  ECF No. 1-1.  On June 5, 2024, Defendant answered, raising affirmative defenses and counterclaims of fraud and breach of contract.  ECF No. 84.  The case is currently scheduled for trial on April 21, 2025.  ECF No. 114.

On August 8, 2024, after Defendant obtained correspondence that it believes indicates that the demolition and repairs of Plaintiff's property were not storm-related but rather reflect a planned renovation, it moved to compel a forensic examination of Plaintiff's computer and phone, which the Court granted.  ECF Nos. 90, 90-1 at 2-3; 95.  The Court issued several extensions of the discovery and pre-trial motion deadlines to allow for completion of the forensic examination.  ECF Nos. 95, 132, 133, 134.  On December 16th, Defendant received the production.  ECF No. 145-1 at 5.

### B.  The Motion to Disqualify

On February 13, 2025, Defendant filed this motion to disqualify Plaintiff's counsel, Binegar and Christopher Stow-Serge, and Binegar's law firm, Binegar and Christian, LLC ("B&C"), on the bases that Binegar is a key and necessary fact witness to Plaintiff's claims and Defendant's affirmative

---

[7] ECF No. 136-8 at 22:22-23:14.
[8] *Id.* at 79:25-80:2.

defenses and counterclaims, and all counsel have violated the Rules of Professional Responsibility by improperly representing Plaintiff as well as 911, Eco, and Benedic.  ECF No. 145-1 at 1-2, 11.

Defendant asserts that evidence has revealed Binegar knew that the Estimate was not for storm-related repairs but for Plaintiff's planned renovation, that 911 planned to demolish the interior yet failed to notify Defendant, and that Ricks was paid by 911 and/or Eco and his mitigation invoice did not reflect the actual costs of 911's services.  *Id.* at 6-7, 9-10.  Defendant argues evidence also revealed a close business relationship between Plaintiff's counsel, 911, Eco, and Ricks, which relationship creates a conflict of interest.  *Id.* at 5-11.  Defendant asserts that Binegar and Stow-Serge currently represent and have previously represented 911 and Eco in various matters seeking payment for mitigation services under AOBs executed by homeowners similar to Plaintiff's AOB.  *Id.* at 7-8.

Defendant argues Binegar must be disqualified pursuant to Rule 3.7 of the Louisiana Rules of Professional Conduct ("Rule") because his personal knowledge makes him a necessary witness.  *Id.* at 11-12.  It also argues that Plaintiff's counsel and B&C must be disqualified under Rule 1.7 because of the significant risk that Plaintiff's representation has been and will be materially limited by counsel's representation of 911 and Eco and certain trial witnesses that all have a financial interest in this matter that conflicts with Plaintiff's interests.  *Id.* at 13-18.  Defendant also argues Plaintiff's counsel and B&C must be disqualified pursuant to Rule 1.9 because they have represented 911 and Eco and related persons in substantially related matters.  *Id.* at 18-20.

In Opposition, Plaintiff argues Defendant's motion is untimely and procedurally improper because it filed the motion after the February 3, 2025, pre-trial motion deadline, Defendant contemplated filing this motion since August 2, 2024, but delayed doing so until less than two months before trial, and Defendant received the forensic examination production on December 16, 2024. ECF No. 155 at 3-6.  Plaintiff also argues Defendant lacks standing to seek disqualification as her counsel has never represented Defendant, her interests are not adverse to 911's interests, the matters

are not substantially related because they involve different claims for houses and different clients with different damages, and she has provided informed consent in writing. *Id.* at 6-13. Plaintiff also argues the testimony Defendant seeks from her counsel regarding the estimate is available through Fleiner and Plaintiff's expert. *Id.* at 19-20.

In Reply, Defendant argues that Plaintiff's counsel are currently representing 911 and Eco in connection to this lawsuit, Stow-Serge has recently represented Eco in a similar case to this matter where the relationship between the homeowner and Eco is nearly identical to that of Plaintiff and 911, and Eco's suit against the homeowner to recover insurance proceeds under the AOB indicates adversity. ECF No. 159 at 1-3, 8-9; *see* ECF No. 156-1. Defendant also argues Plaintiff's counsel's conflicts cannot be waived under Louisiana law[9] because the AOB renders Plaintiff and 911 competitors for a limited amount of insurance proceeds, the limited insurance proceeds cannot fully satisfy both 911 and Plaintiff, and the AOB obligates Plaintiff to pay 911's Invoice. *Id.* at 3-8. Defendant reiterates its argument that Binegar is a necessary fact witness for its defenses and counterclaims. *Id.* at 9-12. Defendant argues it has standing, it did not unreasonably delay filing this motion, and regardless of the deadline, the Court is obliged to consider the motion because it raises potential ethical violations. *Id.* at 12-15.

## II.    APPLICABLE LAW AND ANALYSIS

### A.    Motion to Disqualify Standard

A motion to disqualify is a substantive motion affecting the rights of the parties and is determined by applying standards developed under federal law.[10] Disqualification cases are governed by state and national ethical standards adopted by the court.[11]    When considering attorney

---

[9] ECF No. 159 at 3-4 (quoting *In re Plaisance*, 378 So. 3d 721 (La. 2004))

[10] *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995); *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992).

[11] *F.D.I.C.*, 50 F.3d at 1311–12 (quoting *In re Am. Airlines, Inc.*, 972 F.3d 605, 610 (5th Cir. 1992)).

disqualification, the court considers (1) the local rules in the district; (2) the American Bar Association's ("ABA") Model Rules of Professional Conduct; (3) the ABA's Model Code of Professional Responsibility; and (4) the state rules of conduct.[12]  Local and national ethical canons are useful guides, but they are not controlling.[13]

Disqualification rules are not mechanically applied.[14]  "All of the facts particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights."[15]  Applying an exacting standard for a motion to disqualify is necessary to protect a party's right to counsel of choice and to discourage the use of such motions as a trial tactic.  The court must be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, such as the right of a party to counsel of choice and an attorney's right to freely practice law.[16]  Depriving a party of the right to be represented by the attorney of his or her choice is a penalty that must not be imposed cavalierly[17] or without careful consideration.[18]

In the disqualification context, the "appearance of impropriety" doctrine reflects the notion that even ethical conduct may appear to the layman as unethical and thereby could erode public

---

[12] *Id.* at 1312; *Horaist v. Dr.'s Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001).

[13] *F.D.I.C.*, 50 F.3d at 1314.  The relevant local rules, the Louisiana Rules of Professional Conduct, and the Model Rules are identical.  *Compare* LA. RULES OF PRO. CONDUCT r. 1.7, 1.9, 3.7, *with* MODEL RULES OF PRO. CONDUCT r. 1.7, 1.9, 3.7 (AM. BAR ASS'N 2025). *See* E.D. La. L.R. 83.2.3 (adopting the Rules of Professional Conduct of the Louisiana State Bar Association); *see also CEF Funding, L.L.C. v. Sher Garner Cahill Richter Klein & Hilbert, L.L.C.*, No. 09-6623, 2010 WL 2773116, at *2 & nn. 12-13 (E.D. La. July 9, 2010) (Africk, J.) (finding LRPC 1.7, 1.9, and 3.7 identical to Model Rules 1.7, 1.9, and 3.7 (citing *Lange v. Orleans Levee Dist.*, No. 97-987, 1997 WL 668216, at *2 (E.D. La. Oct. 23, 1997) (Clement, J.))).

[14] *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989); *Church of Scientology of Cal. v. McLean*, 615 F.2d 691, 693 (5th Cir. 1980).

[15] *F.D.I.C.*, 50 F.3d at 1314.

[16] *Woods v. Covington Cty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976) (citing *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 564–65 (2d Cir. 1973)); *see also F.D.I.C.*, 50 F.3d at 1313 (citing *Woods*, 537 F.2d at 813).

[17] *MMR Constr., Inc. v. JB Grp. of La., LLC*, No. 22-267, 2024 WL 5155878, at *17 (M.D. La. Dec. 18, 2024).

[18] *F.D.I.C.*, 50 F.3d at 1313.

confidence in the judicial system or the legal profession.[19]   The court must balance the likelihood of

public suspicion against a party's right to counsel of choice:

> "[T]he disqualification rule requires a balancing of the likelihood of public suspicion against a party's right to counsel of choice." In order to disqualify an attorney under the appearance of impropriety doctrine, "a court must . . . find that the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case."   "A disqualification inquiry, particularly when instigated by an opponent, presents a palpable risk of unfairly denying a party the counsel of his choosing."   Therefore, "[a]ll of the facts particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights."[20]

An attorney's conduct is not, however, governed by standards that can be imputed only to the

most cynical members of the public.[21]   Rather, there must be a "reasonable possibility that some

identifiable impropriety actually occurred."[22]   Thus, "[a]n attorney may be disqualified only when

there is 'a reasonable possibility that some specifically identifiable impropriety' actually occurred

and, in light of the interests underlying the standards of ethics, the social need for ethical practice

outweighs the party's right to counsel of his choice."[23]

## B. **Standing and Timeliness**

### 1. **Standing**

In *In re Yarn Processing Patent Validity Litigation*, the Fifth Circuit stated:  "As a general

rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former [or

current] client moves for disqualification"[24] because of the possible tactical use of a motion to

---

[19] *Woods*, 537 F.2d at 813.

[20] *Treece v. Perrier Condo. Owners Ass'n, Inc.*, 559 F. Supp. 3d 530, 541 (E.D. La. 2021) (Morgan, J.) (citations omitted).

[21] *Id.* (quoting *Woods*, 537 F.2d at 813).

[22] *Id.* (quoting *F.D.I.C.*, 50 F.3d at 1316; and citing *Woods*, 537 F.2d at 813).

[23] *United States v. Kitchin*, 592 F.2d 900, 904 (5th Cir. 1979) (quoting *Woods*, 537 F.2d at 812-13).

[24] *Landmark Am. Ins. Co. v. Gargoyle Mgmt. Inc.*, No. 24-38, 2024 WL 5424896, at *3 (N.D. Tex. Nov. 19, 2024) (brackets in original) (quoting *Yarn Processing*, 530 F.2d 83, 88 (5th Cir. 1976); and citing *In re Dresser*, 972 F.2d at 542, 544 (evaluation motion to disqualify filed by current client); *see also Nagle v. Gusman*, No. 12-1910, 2015 WL 1525827, at *3, *5-6 (E.D. La. Apr. 2, 2015) (Vance, J.) (considering whether opposing party may move to disqualify based on LRPC 1.7 in accordance with *Yarn Processing*).

disqualify.[25]  Thus, courts generally decline to allow a party "to champion the rights of the former client" via a motion to disqualify.[26]  This general rule is subject to several identified exceptions for cases in which "'the unethical change of sides [is] manifest and glaring' or 'open and obvious,' thereby 'confront[ing] the court with a plain duty to act.'"[27]

For instance, in *In re Gopman,* the Fifth Circuit held that a party had standing to disqualify opposing counsel because of conflicts of interest, even though counsel did not represent the party (i.e, the Government).[28]  The court cited the duty to bring possible ethical violations to the court's attention and the court's inherent authority to regulate professional conduct in reaching that conclusion.[29]  Likewise, in *Nagle v. Gusman*, Judge Vance allowed an opposing counsel to raise alleged violations of Rules 1.7 and 1.9 by assessing first whether there were potential ethical conflict issues.[30]

A court "is obliged to take measures against unethical conduct occurring in connection with any proceeding before it,"[31] including alleged conflicts of interest.[32]  Such duty is self-imposed by the court's authority "to determine who may practice before [it] and to regulate the conduct of those

---

[25] *See Yarn Processing*, 530 F.3d at 90.

[26] *Id.*

[27] *Nagle*, 2015 WL 1525827, at *3 (brackets in original) (quoting *Yarn Processing*, 530 F.2d at 88-89); *see also In re Andry*, No. 15-2478, 2020 WL 5982898, at *10 n.116 (E.D. La. Oct. 8, 2020) (Morgan, J.); *Landmark Am. Ins.*, 2024 WL 5424896, at *3.

[28] 531 F.2d 262, 265-66 (5th Cir. 1976) (citations omitted).  "

[29] *Id.*; *see also Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.,* 563 F.2d 671, 673 (5th Cir. 1977) (per curiam) ("And appellant has standing to seek disqualification even though it is not an aggrieved client because its attorneys are authorized to report any ethical violations committed in the case." (citing *Gopman*, 531 F.2d at 265-66)); *see also King v. Martin*, No. 10-1774, 2012 WL 4959485, at *3 (W.D. La. Oct. 16, 2012) (citations omitted) (finding standing in accordance with *Brown & Williamson*).  The rule of orderliness provides that when there are conflicting panel decisions, the earliest panel decision controls."  *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 542 (5th Cir. 2007) (citing *Camacho v. Tex. Workforce Comm'n*, 445 F.3d 407, 410 (5th Cir. 2006)), *abrogated on other grounds*, *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010).  Thus, *Yarn Processing* is controlling.  *See Landmark Am. Ins.*, 2024 WL 5424896, at *4 (recognizing *Yarn Processing* as controlling panel decision); *Clemens v. McNamee*, No. 08-471, 2008 WL 1969315, at *3 (S.D. Tex. May 6, 2008) (same).

[30] *See* 2015 WL 1525827, at *6 ("Both of the potential ethical violations *identified* by the Court are 'open and obvious'; thus, this case fits within [*Yarn Processing*]'s exceptions, and the Court can intervene.") (emphasis added).

[31] *Woods*, 537 F.2d at 810.

[32] *United States v. Roark*, 288 F. App'x 182, 186 (5th Cir. 2008) ("We have recognized a district court's inherent authority to take measures against conflicts of interest when they arise 'in connection with any proceeding before it.'" (quoting *Woods*, 537 F.2d at 510)).

who do" that is within the court's inherent judicial power.[33]  Thus, even if the *Yarn Processing* exceptions were not applicable, the Court properly considers the potential ethical violations.[34]

### 2. Timeliness

"Lawyer conflict of interest problems *ought* to be brought up long before the date of the trial in an atmosphere which does not cast a shadow over the trial itself."[35]  A motion to disqualify should be made with "reasonable promptness after a party discovers the facts which lead to the motion. A litigant may not delay filing . . . to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of the case has been completed."[36]  Failure to timely object to a conflict may be deemed a waiver.[37]  When considering waiver, the Court considers "when the movant learned of the conflict, why the delay occurred, whether the motion was delayed for tactical reasons, and whether disqualification would result in prejudice to the nonmoving party."[38]

Plaintiff argues the motion is untimely because Defendant filed it after the pretrial motion deadline.  While the timing of the filing is undesirable, that alone is not a sufficient reason for the Court to abandon its duty to address this matter.[39]

---

[33] *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *United States v. Dinitz*, 538 F.2d 1214, 1219 (5th Cir. 1976)).

[34] *See Johnson v. Clark Gin Serv., Inc.*, No. 15-3290, 2016 WL 7017267, at *3, *7-8 (E.D. La. Dec. 1, 2016) (Brown, C.J.) (considering the merits of a party's motion to disqualify based on Rule 1.7 violation pursuant to *Woods* and not first analyzing for whether the party had standing under *Yarn Processing* despite the party arguing the exceptions applied); *see also Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir. 1980) (per curiam) (finding court erred in failing to address the merits of a motion to disqualify counsel based on an alleged conflict of interest in light of *Woods*).

[35] *Hertz Corp. v. Caulfield*, No. 89-4847, 1992 WL 53610, *3 (E.D. La. Mar. 10, 1992) (emphasis added) (quoting *Redd v. Shell Oil Co.*, 518 F.2d 311, 316 (10th Cir. 1975)).

[36] *Id.* (quoting *Cox v. Am. Cast Iron Pipe Co.*, 847 F.2d 725, 729 (11th Cir. 1988)).

[37] *Id.* (citing *Sorenson v. First Wis. Nat'l Bank of Milwaukee, N.A.*, 931 F.2d 19 (8th Cir. 1991); *Cox*, 847 F.2d at 729-30); *Yarn Processing*, 530 F.2d 83; *see also Yarn Processing*, 530 F.2d at 90 ("Public confidence in the privacy of [attorney-client] discussion should not be impaired where the former client, having every opportunity to do so, *fails to object* to a new relationship involving his former attorney . . . .") (emphasis added).

[38] *Conwill v. Greenberg Traurig, L.L.P.*, No. 09-4365, 2010 WL 11538418, at *6 (E.D. La. Dec. 23, 2010) (Africk, J.) (quoting *Zichichi v. Jefferson Ambulatory Surgery Ctr.*, No. 07-2774, 2008 WL 2859232, at *6 (E.D. La. July 22, 2008) (Vance, J.)).

[39] *See Martin v. Affordable Care, LLC*, No. 21-0585, 2023 WL 4875878, at *2, *4 (W.D. La. July 31, 2023) (noting that the timing of the motion to disqualify was "undesirable" because it was filed less than a month before trial but nonetheless considering the merits because of the court's duty to supervise the conduct of attorneys who appear before it).

Plaintiff also argues waiver.[40]  But Defendant is not a former client.[41]  Further, while Defendant raised the possibility of disqualification six months before the filing of the motion,[42] the delay in filing resulted from the delayed forensic examination production.[43]  Given that Defendant's motion relies on this recently produced evidence, the motion cannot be characterized as a tactical delay or establishing waiver.  And while disqualification could be prejudicial at this late date were the trial not continued, the availability of a continuance alleviates that prejudice.

### C.  Disqualification Under Rule 1.7

Defendant argues Plaintiff's counsel must be disqualified pursuant to Rule 1.7 because there is a conflict of interest between Plaintiff and counsels' other clients (911 and Eco) and purported clients (Benedic, Ricks, and Diez) who are listed trial witnesses.[44]  It argues that the AOB pits Plaintiff and 911 against each other because Plaintiff's claims and 911's Invoice both seek to exhaust the policy's $291,000 Dwelling limit.[45]  It also argues the representation of Plaintiff will be materially limited by counsels' responsibilities to 911 and Eco and the trial witnesses, because of their financial interest in the outcome.

---

[40] ECF No. 155 at 4 (citing *Hertz Corp.*, 1992 WL 53610, at *3 (finding that the moving party's failure to timely object to the representation amount to waiver of conflict)).

[41] Whether waiver has occurred is premised on the movant being a former client who delays exercising its "*right* to move to disqualify" counsel. *Zichichi*, 2008 WL 2859232, at *6 (emphasis added); *see also id.* (citing *Yarn Processing*, 530 F.2d at 89-90) (*former clients* may expressly or impliedly waive objection and consent to adverse representation)) (emphasis added); *Hertz Corp.*, 1992 WL 53610, at *3 ("A *former client* may be deemed to have waived a conflict by failure to file a timely objection.") (emphasis added).

[42] ECF No. 88 at 2 nn.1-2; *see Hertz Corp.*, 1992 WL 53610, at *3 (finding a year and a half delay sufficiently long and citing cases in support where delay was more than a year); *Zichichi*, 2008 WL 2859232, at *6 (finding waiver when movant delayed filing for "over a year").

[43] *See King*, 2012 WL 4959485, at *3 (finding no waiver despite opposing party arguing movant knew of conflict for three years because movant only discovered relevant information three months before filing the motion to disqualify); *Conwill*, 2010 WL 11538418, at *6 (finding no waiver because, among other things, movant had just realized the conflict three months before filing); *Weeks v. Indep. Sch. Dist. No. I-89 of Okla. Cnty.*, 230 F.3d 1201, 1212-13 (10th Cir. 2000) (distinguishing *Redd* because, unlike in that case, the movant "did not receive adequate information" until days before filing motion).

[44] ECF No. 161 at 3.

[45] ECF No. 159 at 4-5; *see also* ECF No. 46-6 at 7.

Rule 1.7 states:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involved a concurrent conflict of interest. A concurrent conflict of interest exists if:
    (1) the representation of one client will be directly adverse to another client; or
    (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client, a former client, or a third person or by a personal interest of the lawyer.
(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
    (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
    (2) the representation is not prohibited by law;
    (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
    (4) each affected client gives informed consent, confirmed in writing.

A directly adverse conflict arises when a lawyer advocates against a person in one matter who is also the lawyer's client in another matter, even if the matters are unrelated, or when the lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client.[46]

The comments to Model Rule 1.7 states: "[A] conflict of interest exists [within the meaning of 1.7(a)(2)] if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate cause of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests."[47] "The conflict in effect forecloses alternatives that would otherwise be available to the client"; however, the possibility of future harm "does not itself require disclosure or consent."[48] The court considers "the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of

---

[46] MODEL RULES OF PRO. CONDUCT r. 1.7 cmt. 6.
[47] *Id.* at cmt. 8.
[48] *Id.*

the client."[49]  Rule 1.7 applies not only to present conflicts, but also to potential conflicts.[50]  Courts apply Rule 1.7 in the joint representation context,[51] but its application is not limited to joint representation conflicts.[52]

In applying Rule 1.7 to this matter, the Court must first consider to what extent an attorney-client relationship exists between Plaintiff's counsel and 911, Eco, Benedic, Ricks, or Diez and, if so, whether there is a current or former client relationship.  Then, the Court considers whether there is either direct adversity or a significant risk of a material limitation.  If there is a conflict, the Court must determine whether the conflict is waivable and, if so, whether there has been informed consent.

### 1.  Attorney-Client Relationship & Determining Status of the Client

"Courts in Louisiana apply the Restatement (Third) of the Law Governing Lawyers to determine if an actual attorney-client relationship exists."[53]  An attorney-client relationship arises when:

(1) a person manifests to a lawyer the person's intent that the lawyer provide legal
    services for the person; and either
    (a) the lawyer manifests to the person consent to do so; or
    (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or
        reasonably should know that the person reasonably relies on the lawyer to
        provide the services; or
(2) a tribunal with power to do so appoints the lawyer to provide the services.[54]

---

[49] *Id.*

[50] *See United States v. Jefferson Cnty.*, No. 75-666, 2008 WL 11394184, at *10-11 (analyzing Rule 1.7(b) of Alabama's Rules of Professional Conduct, which is virtually identical to 1.7(a)(2) of the Model Rules, and stating paragraph (b) covers "both actual conflicts and certain *potential* conflicts that are *likely*  to arise" based on a comment's language that is the same as that of Comment 8) (emphasis in original); *Guillen v. City of Chi.*, 956 F. Supp. 1416, 1426 (N.D. Ill. 1997) (same finding and reasoning when analyzing Rule 1.7(b) of the Northern District of Illinois's Rules of Professional Conduct); *see also* MODEL RULES OF PRO. CONDUCT r. 1.7 cmt. 23 (stating "*simultaneous* representation of parties whose interest *may* conflict . . . is governed by [1.7](a)(2)") (emphasis added).

[51] *See Johnson*, 2016 WL 7017267, *9-10.

[52] MODEL RULES OF PRO. CONDUCT r. 1.7 cmt. 8 (noting joint representation scenario as an "example" of when Comment 8 could apply); *see also Waneck v. CSX Corp.*, No. 17-106, 2017 WL 11695758, at *7 (S.D. Miss. Aug. 25, 2017) (finding Rule 1.7(a)(2) conflict using language from Comment 8 when one of counsel's clients was not a party to the matter), *R&R adopted*,  2017 WL 5157394 ( S.D. Miss. Nov. 7, 2017).

[53] *Sempiterno in Motion, LLC v. Cajun 417, LLC*, No. 20-681, at *8 (E.D. La. Aug. 25, 2020) (Africk, J.) (citing *Zichichi*, No. 2008 WL 2859232, at *3 (citing *In re Austin*, 943 So. 2d 341 (La. 2006))).

[54] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 (2000).

13

While courts give "great deference to the client's subjective belief whether an attorney-client relationship exists" in examining whether a lawyer manifested sufficient consent, "the overarching question is whether there is a reasonable objective basis to determine that an attorney-client relationship is formed."[55] "No written contract is required in order to establish the relationship," and the "client need not necessarily pay or agree to pay the lawyer."[56]

When the client is an organization,

[a] lawyer who has been employed or retained to represent an organization as a client owes professional duties of loyalty and competence to the organization. By representing the organization, a lawyer does not thereby also form a client-lawyer relationship with all or any individuals employed by it or who direct its operations or who have an ownership or other beneficial interest in it, such as its shareholders. However additional circumstances may result in a client-lawyer relationship with constituents while the lawyer concurrently represents the organization [ ] . . . . A "constituent" . . . includes an officer, director, or employee of the organization. A shareholder of a stock corporation or a member of a membership corporation is also a constituent.[57]

Regarding the "additional circumstances,"

An implication that such a relationship exists is more likely to be found when the lawyer performs personal legal services for an individual as well or where the organization is small and characterized by extensive common ownership and management. But the lawyer does not enter into a client-lawyer relationship with a person associated with an organizational client solely because the person communicates with the lawyer on matters relevant to the organization that are also relevant to the personal situation of the person. In all events, the question is one of fact based on the reasonable and apparent expectations of the person or entity whose status as client is in question.[58]

---

[55] *Sempiterno*, 2020 WL 5017667, at *8 (quoting *Austin*, 943 S. 2d at 348).

[56] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 cmt. c; *see also Advanced Mfg. Techs., Inc. v. Motorola, Inc.*, No. 99-01219, 2002 WL 1446953, at *5 (D. Ariz. July 2, 2002) (applying Restatement test and finding "the fact that [nonparty] never signed any fee agreement nor paid [counsel] or his firm for his representation at his depositions is not controlling and do not preclude the Court from concluding that an attorney-client relationship was impliedly created between them.").

[57] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 96 cmt. b.

[58] *Id.* § 14 cmt. f.

"Ultimately, it is the lawyer's responsibility to clarify whether there is an attorney-client relationship."[59]

In determining whether a party's counsel has another current client for purposes of Rule 1.7, the court considers whether counsel's representation of the party overlaps in time with that of a client in another matter.[60]  Courts have found the that the "'current client' conflict of interest analysis applies even when representation ceases prior to the filing of a motion to disqualify."[61]  Otherwise, "the challenged attorney could always convert a present client into a 'former client' by choosing when to cease to represent the disfavored client."[62]

    a.  ECO and 911

In this case, the evidence establishes that Binegar currently represents 911 and Eco.  In conjunction with Plaintiff's Opposition memorandum, Benedic's affidavit states "Binegar . . . currently represents my companies[, 911 and Eco,] in certain matters."[63]  Further, Binegar has

---

[59] *Sempiterno*, 2020 WL 5017667, at *8 (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 cmt. f ("[A] lawyer's failure to clarify whom the lawyer represents in circumstances calling for such a result might lead a lawyer to have entered into client-lawyer representations not intended by the lawyer. Hence, the lawyer must clarify whom the lawyer intends to represent when the lawyer knows or reasonably should know that, contrary to the lawyer's own intention, a person, individually, or agents of an entity, on behalf of the entity, reasonably rely on the lawyer to provide legal services to that person or entity.")).

[60] *See Swear v. Lawson*, No. 15-6591, 2017 WL 11508947, at *6 (E.D. La. Jan. 19, 2017) (Brown, C.J.) (finding plaintiff a "current client" of defendant's counsel because counsel represented plaintiff in another for "several months before [counsel] requested to withdraw from representing [plaintiff] in an attempt by [counsel] to free himself to represent Defendants in this case"); *see also Rembrandt Techs., LP v. Comcast Corp.*, No. 05-443, 2007 WL 470631, at *3 (E.D. Tex. Feb. 8, 2007) (holding a company be considered a "current client" of a law firm for purposes of a motion to disqualify when the alleged adverse client "was a client of [the firm] during the pending of the case") (citing *Snapping Shoals Elec. Membership Corp. v. RLI Ins. Corp.*, No. 05-1714, 2006 WL 1877078, at *2 (N.D. Ga. July 25, 2006))).

[61] *Swear*, 2017 WL 11508947, at *6 (citing *Unified Sewerage Agency of Wash. Cty. v. Jelco Inc.*, 646 F.2d 1339, 1345 (9th Cir. 1981); *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 209 (S.D. N.Y. 2009)("[W]here counsel have simultaneously represented clients with differing interests, the standard for concurrent representation applies even if the representation ceases prior to the filing of a disqualification motion."); *Anderson v. Nassau Cnty. Dep't of Corr.*, 376 F. Supp. 2d 294, 298 (E.D. N.Y. 2005) ("[T]he status of the relationship is assessed at the time that the conflict arises.")).

[62] *Id.* (quoting *Unified Sewerage Agency*, 646 F.2d at 1345 n.4).

[63] ECF No. 155-3 ¶¶ 1-2.

represented 911 in other matters while representing Plaintiff in this matter.[64]  Less clear, however, is whether Stow-Serge currently represents 911 and/or Eco for purposes of this motion.

Benedic testified that Stow-Serge "does not currently represent me or my company in any lawsuits, though he has provided legal services in the past."[65]  Defendant attached state court filings indicating that Stow-Serge served as counsel for 911 and Eco,[66] but the filings do not reflect whether Stow-Serge represented either 911 or Eco when he enrolled as Plaintiff's counsel in this case on May 10, 2024.[67]  Although Defendant argues that Stow-Serge represented Eco in a matter in February 2025,[68] it provides no evidence to support that contention.  The evidence does establish, however, that Benedic sought and received assistance from Stow-Serge in preparing documents in response to Defendant's subpoena to Eco dated May 13, 2024[69] and that Stow-Serge asserted attorney-client privilege during the August 9, 2024, Rule 30(b)(6) deposition of Eco and 911 through Benedic.[70] Thus, the Court considers Eco to be a current client of Stow-Serge.

As the moving party, Defendant bears the "burden of proving a conflict of interest requiring disqualification."[71]  Defendant has proven that Binegar currently represents 911 and Eco and that Stow-Serge currently represents Eco for purposes of this motion to disqualify.  Movant has not, however, established that Stow-Serge currently represents 911 (i.e., the AOB contracting party) for purposes of this motion.

---

[64] *Compare* ECF No. 146-8 (Binegar's letter of representation Defendant's administrator dated December 1, 2021), *with* ECF No. 145-5 at 3 (911's Petition for Damages filed by Binegar in state court on August 29, 2023), *and* ECF No. 145-7 at 6 (911's Petition for Damages and Petition to Appoint Umpire filed by Binegar in state court on October 28, 2024).
[65] ECF No. 155-3 ¶¶ 1-2.
[66] *See* ECF Nos. 145-3 ( Eco's Petition for Breach of Contract and Damages filed by Stow-Serge on August 28, 2023, in *Eco Energy & Solutions, LLC vs. Thomas*, 24th JDC, No. 846-302); 145-4 at 4-13 (911's Petition for Breach of Contract and Damages filed by Stow-Serge on February 15, 2024, in *911 Restoration LLC vs. Cancienne*, 29th JDC, No. 93847).
[67] *See* ECF Nos. 73, 75.
[68] ECF No. 159 at 1-2.
[69] ECF Nos. 136-8 at 92:20-94:14; 145-14 at 1.
[70] ECF No. 136-8 at 11:18-25.
[71] *Treece*, 559 F. Supp. 3d at 535 (*United States vs. DeCay*, 406 F. Supp. 2d 679, 683 (E.D. La. 2005) (Barbier, J.) (citing *F.D.I.C.*, 50 F.3d at 1316)).

b.   <u>Diez and Ricks</u>

Defendant argues that Diez is a client of Binegar and Christian because they prepared him for deposition and assisted with his response to the subpoena duces tecum.[72]  Explaining what a witness should expect in a deposition[73] is far different than a witness explicitly claiming that party's counsel represented him at his deposition and prepared him by giving specific guidance (legal advice) regarding likely deposition questions and approaches to answering questions as in *Advanced Manufacturing Technologies, Inc. v. Motorola, Inc.*[74]  Diez appears to have been a constituent of 911 and/or Eco, and nothing indicates an attorney-client relationship between Diez and Binegar or Christian. Similarly, no evidence establishes that Ricks manifested an intent for either Stow-Serge or Binegar to provide him personal legal services.

c.   <u>Benedic</u>

Defendant argues that Benedic is a client of both Stow-Serge and Binegar because he has worked with B&C since 2020, Binegar has provided legal services for mitigation insurance claims, Stow-Serge has worked with his companies since either "2022 or 2023,"[75] they assisted him in responding to Defendant's subpoena to Eco,[76] and Stow-Serge not only prepared him for his deposition, but Stow-Serge objected based on attorney-client privilege.[77]

*Sempiterno in Motion, LLC v. Cajun 417, LLC* addressed the issue of whether an attorney-client relationship existed between counsel to restaurant companies and the family of owners of the restaurant companies.  The managing owner initially retained counsel to provide trademark-related services for the managing owner's LLC, but counsel later advised the family on intellectual property

---

[72] ECF No. 145-1 at 15; *see also* ECF No. 61-6 at 8.
[73] *See* ECF No. 61-6 at 8:16-22.
[74] *See* 2002 WL 1446953, at *4.
[75] ECF No. 136-8 at 11:3-8, 12:15-18.
[76] *See id.* at 92:20-94:14; ECF No. 145-14 at 1-3.
[77] ECF No. 136-8 at 9:8-23, 11:11-12:5.

rights in relation to their expansion efforts, working on strategy and branding in general.[78]    The managing owner and counsel disagreed as to whether an attorney-client relationship existed.[79]    Judge Africk held that the attorney-client relationship was not confined to the organizations and reached the family of owners,[80] reasoning that, while a constituent's communication with counsel "on behalf of the organizations would not suffice to establish a relationship,"[81] the family's "reasonable expectations" that they were counsel's clients do, and their expectations were not "unreasonable" because the Restatement places the onus on the lawyer to clarify the bounds of representation.[82]

Unlike *Sempiterno*, there is no evidence that Benedic considered Binegar or Stow-Serge as his personal lawyers nor that he sought personal legal services.  Rather, the evidence establishes that Benedic communicated with them and sought their services on behalf of his companies,[83] which companies are their clients.  Based on the evidence submitted, Defendant has not established the existence of an attorney-client relationship between Benedic and Binegar or Stow-Serge.

## 2.    Whether a Concurrent Conflict of Interest Exists

Having found that neither Diez, Ricks or Benedic are clients of either Binegar or Stow-Serge, but that both 911 and Eco are current clients of Binegar, and Eco is a current client of Stow-Serge,[84]

---

[78] *See Sempiterno*, 2020 WL 5017667, at *2.

[79] *See id.* at *2-*3.

[80] *Id.* at *9.

[81] *Id.*; *see* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 cmt. f ("[T]he lawyer does not enter into a client-lawyer relationship with a person associated with an organizational client solely because the person communicates with the lawyer on matters relevant to the organization that are also relevant to the personal situation of that person.").

[82] *Sempiterno*, 2020 WL 5017667, at *9.

[83] An organization "can only act through its agents."  *In re Bevill, Bresler & Schulaman Asset Mgmt. Corp.*, 805 F.2d 120, 125 (3d Cir. 1986).

[84] A lawyer that represents an organization does not "necessarily represent any constituent or affiliated organization, such as a parent or subsidiary." MODEL RULES OF PRO. CONDUCT r. 1.7 cmt. 34.  However, there are some circumstances where "an affiliate should be considered a client of the lawyer." *Id.*; *see Dr. Falk Pharma GmbH v. GeneriCo, LLC*, 916 F.3d 975, 982 (Fed. Cir. 2019) ("Circumstances in which an affiliate is considered a client of a lawyer can arise by express agreement or when affiliates are so interrelated that representation of one constitutes representation of all." (citing *GSI Com. Sols., Inc. v. BabyCenter, LLC*, 618 F.3d 204, 210-212 (2d Cir. 2010))).  Defendant describes Eco as the parent company of 911.  ECF No. 145-1 at 1.  But Benedic states the entities are no longer related.  ECF No. 136-8 at 33:5-18.  It is Defendant's burden to prove otherwise, and since it has not, Eco is not considered the parent of 911.  Further, though 911 and Eco are sister companies, Defendant has not provided an express agreement that representation of one is also representation of the other and has not argued there are circumstances that 911 and Eco are so interrelated.  Thus, representation of one is not representation of both.

the Court must address Defendant's argument that Plaintiff is directly adverse to 911 and/or Eco because the AOB in favor of 911 (1) assigns all insurance proceeds to satisfy the $180,107.84 Invoice, (2) obligates Plaintiff to cover the difference, and (3) obligates her to assist in invoking the appraisal clause if her insurer disagrees with scope and/or pricing of 911 services.[85]

This matter does not involve direct adverse representation under Rule 1.7(a)(1) because Binegar and Stow-Serge are not representing Plaintiff against 911 or Eco, or vice versa, in this matter or any other matter involving Plaintiff.[86]  Nor has Defendant shown it will be necessary for either to cross-examine any of their clients.  However, the Court has identified material limitation conflicts under Model Rule 1.7, comment 8.

Considering Defendant's counterclaims and Diez's testimony, Plaintiff has an interest in filing suit against 911 and/or contesting its $180,107.84 Invoice.[87]  911 has an interest in not being sued. The difference of interests is apparent.  Further, Plaintiff has an interest in paying only the true "amount"[88] of the value of 911's mitigation services from any insurance proceeds recovered from Defendant and/or her personal funds after exhaustion of policy limits.[89]  911 has an interest in recovering its $180,107.84 Invoice.  These conflicting interests are apparent from the actual cost of 911's services ($11,131.13) versus the amount billed ($180,107.84) versus the policy limits ($291,000).  Plaintiff's assertions that she and 911 are aligned[90] and she does not dispute the necessity

---

[85] ECF No. 145-9 at 2 ("Assignment of Insurance Benefits and Direct Payment Authorization"), 3 ("Value of Contract").
[86] *See Robertson v. AstraZenaca Pharms., LP*, No. 15-438, 2015 WL 5774774, at *4 (E.D. La. Sept. 30, 2015) (Barbier, J.) ("Plaintiff failed to prove a conflict of interest under Rule 1.7. Adams and Reese represents AstraZeneca in this matter and the Malpractice Defendants in a related proceeding in state court. It does not represent AstraZeneca in a case against Malpractice Defendants, or vice versa.").
[87] The counterclaims are partly based on allegations that 911 did not conduct any "testing, moisture scanning, sampling, or required testing" before the demotion, and that Plaintiff did not submit any required documentation related to the demolition until after and did not inform Minuteman or Defendant about the demolition.  ECF No. 84 at 10-11 (¶¶ 18-20).  Diez testified he did not perform any lab testing or sampling at the initial inspection, nor did he do moisture scanning because he was "comfortable" with a visual inspection.  ECF No. 61-6 at 32-34.  He also testified he did not perform an estimate.  *Id.* at 47.  Plaintiff testified she had Diez "calling" to inform Defendant (ECF No. 46-9 at 183:10), but he never did.  *See supra* note 3.
[88] ECF No. 145-9 at 3.
[89] ECF No. 1-1 ¶ 57.
[90] ECF No. 155 at 8.

or scope of the services[91] does not alter the significant likelihood that their differing interests exist, particularly in light of the evidence that 911 and Eco have sued other property owners for breach of contract and unjust enrichment under the same form AOB at issue in this case.[92]

Second, Binegar's independent professional judgment has been materially limited due to his loyalty to 911[93] and there is a significant risk that the material limitation will continue. Binegar could not and cannot consider, recommend or carry out the reasonable course of action of filing suit against 911 based on Defendant's counterclaims or the inflated charges for 911's services because that course of action is foreclosed by his representation of and loyalty to 911.[94] Whether either of the suits would be successful is irrelevant[95] because in determining the existence of a conflict, the question is whether there is "a significant risk that [the] lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited" due to the lawyer's other responsibilities or interests.[96] Because of Binegar's loyalty to 911, he has been and will continue to be unable to pursue a claim against 911.

---

[91] ECF No. 155-4 ¶ 8.

[92] *Compare* ECF No. 145-9 at 1 ("Contract For Services, Assignment of Benefits, Direct Payment Authorization"), 3 ("(Value of Contract to be Determined), and Owner agrees to make payment for the full amount through insurance proceeds for the job with the exception of the deductible and any non-recoverable depreciation amounts, which will be paid by Owner funds."), *with* ECF No. 145-3 ¶¶ XIII, XXX, *and* ECF No. 145-4 at 4-5 (¶¶ 9-12). The owner in the Eco suit has filed a reconventional demand alleging circumstances that appear to have happened to Plaintiff as well. *See* ECF No. 159-1 ¶¶ 45-46 (Eco "required" owner "to sign a 'contract' that contained no price that could be ascertained by computation of definitive facts" and Eco "prepared an inflated and unsubstantiated estimate for remedial services . . . . [Owner] was never provided proof of services rendered, such as computation of hourly work, subcontracts, or receipts."), 54 ("[Eco] never kept [owner] apprised of the costs that were being incurred, intentionally keeping [owner] in the dark about what he was being charged, and then submitted one bill for the entire claimed amount.").

[93] *See Waneck*, 2017 WL 11595758, at *7 (finding "there is no issue as to if and when a conflict might eventuate" as "it already has" because counsel's representation to party client has been materially limited by counsel's representation of nonparty client "[t]he moment" counsel agreed to represent the nonparty).

[94] *See id.* (finding counsel's representation materially limited by his representation to nonparty client who may be liable to party client because the representation "forclose[d]" courses of action to party client) (brackets in original).

[95] *Johnson*, 2016 WL 7017267, at *11 ("In determining the existence of a conflict, the question is not whether a party's claim is likely to succeed . . . .").

[96] Model Rules of Pro. Conduct r. 1.7 cmt. 8.

Accordingly, the Court finds that concurrent conflicts of interest exist in Binegar's representation of Plaintiff and 911. These ethical violations are "open and obvious," and thus must be addressed under *Yarn Processing*'s exceptions in light of movant's status as a non-client.

### 3. Whether Consent is Available for the Conflict

A client may consent to representation notwithstanding a conflict if all four conditions of Rule 1.7(b) are met. However, "some conflicts are nonconsentable, meaning that the lawyer involved cannot properly ask for such agreement or provide representation on the basis of a client's consent."[97] These prohibited representations exist in the absence of any one of the first three conditions of 1.7(b): (1) the lawyer reasonably believes he will be able to provide competent and diligent representation to the each affected client; (2) the representation is not illegal; and (3) the representation does not involve the assertion of a client by one client against another of the lawyer in the same litigation or other proceeding.[98] Even if the conflict "arises after representation has been undertaken," a lawyer may only continue the representation if the four Rule 1.7(b) conditions are met.[99]

When multiple clients are involved, the question of whether consent is permissible must be resolved as to each client.[100] Even when the representation is subject to consent, each affected client must give "informed consent, confirmed in writing."[101] "Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of the client."[102] The information required depends on the nature of the conflict and risks involved.[103]

---

[97] MODEL RULES OF PRO. CONDUCT r. 1.7 cmt. 14.
[98] *Id.* at cmts. 15-17.
[99] *Id.* at cmt. 4.
[100] *Id.* at cmt. 14.
[101] *Id.* at 1.7(b)(4).
[102] *Id.* at cmt. 18.
[103] *Id.*

Defendant argues Rule 1.7(b)(3) applies in light of *In re Plaisance* to preclude Plaintiff's ability to consent to the conflict.  In *Plaisance*, the Louisiana Supreme Court described the joint representation of a car accident driver and passenger as an "unwaivable conflict" and noted that the clients had a concurrent conflict of interest because the driver may have been partially liable for the passenger's injuries.[104]  Although *Plaisance* does not indicate which 1.7(b) paragraph applied, and while Rule 1.7(b)(3) does not necessarily require one client to name the other client as a defendant in the former's claim, paragraph (b)(3) appears to require the assertion of a claim that attributes fault to the other client.[105]  Plaintiff did not name 911 as a defendant in this matter, and even considering the "context of the proceeding,"[106] paragraph (b)(3) is inapplicable because Plaintiff has not asserted a claim that requires a finding that 911 is at fault.

Paragraph (b)(1), however, does apply.  Representation is prohibited under paragraph (b)(1) "if in the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation."[107]  Diligence required Binegar to pursue a claim against 911 based on the allegations raised in the counterclaims as well as the $180,107.34 Invoiced charges for work that actually cost only $11,131.13 because, in pursuing a matter on Plaintiff's behalf, a lawyer should "take *whatever* lawful and ethical measures are required to vindicate a client's cause or endeavor."[108]  Because Binegar necessarily cannot take a course of action adverse to 911, a reasonable lawyer would conclude it is not possible to competently *and* diligently represent both Plaintiff and

---

[104] *See* 378 So. 3d at 721, 727.
[105] *Johnson*, 2016 WL 7017267, at *12 (finding paragraph (b)(3)'s application "probable," even though clients do not "specially name each other in their complaints," because the claims of negligence against defendant company based on *respondeat superior* and failure to warn require a finding that employee client was at fault).
[106] Model Rules of Pro. Conduct r. 1.3 cmt. 17.
[107] *Id.* at cmt. 15.
[108] Model Rules of Pro. Conduct r. 1.3 cmt. 1 (emphasis added).

911 under the circumstances.[109]  Thus, regardless of Plaintiff's and Benedic's purported waivers, there is a conflict of interest that is not amenable to consent under Rule 1.7(b)(1).[110]

Although "depriving a party of the right to be represented by the attorney of his or her choice is a penalty that must not be imposed without careful consideration,"[111] the evidence in this case establishes the existence of a serious concurrent conflict of interest that is not subject to consent. Thus, disqualification of Binegar from this matter is necessary.[112]  Social interests also weight in favor of disqualifying counsel because the concurrent conflict of interest has "the appearance of impropriety in general" and there is "a possibility that a specific impropriety will occur," if it has not already.[113] Binegar necessarily has tempered his representation of Plaintiff and will continue to do so to protect the conflicting interest of his other client, 911; thus there is a "strong likelihood that 'public suspicion from the impropriety' would outweigh 'any social interests' which would be served" by Binegar continuing to participate in this case.[114]  Consequently, Binegar's firm, B&C, must be disqualified pursuant to Rule 1.10(a).[115]  Thus, Christian must be disqualified as well due to the imputation of Binegar's nonpersonal conflict of interest.

---

[109] *Cf. Waneck*, 2017 WL 11695758, at *8 (finding paragraph (b)(1) applied because nonparty client was potentially liable for party client's injuries and counsel necessarily "cannot pursue any claim" against nonparty client for the injuries).

[110] Even if Plaintiff and Benedic could consent, the Court would refuse the waivers because "a district court is 'allowed substantial latitude in refusing waivers of conflicts of interest' for an actual conflict of interest or a serious potential conflict that may arise during trial." *Waneck*, 2017 WL 5157394, at *4 (quoting *United States v. Jackson*, 805 F.3d 200, 202 (5th Cir. 2015) (quoting *Wheat v. United States*, 486 U.S. 153, 163 (1988)); and citing *Am. Airlines*, 972 F.2d at 611 (confirming that courts must be sensitive to preventing conflicts of interest, and a district court must take "measures against unethical conduct occurring in connection with any proceeding before it)).

[111] *F.D.I.C.*, 50 F.3d at 1313.

[112] *Johnson*, 2016 WL 7017267, at *13 (citing cases).

[113] *F.D.I.C.*, 50 F.3d at 1314.

[114] *Johnson*, 2016 WL 717267, at *13 (quoting *F.D.I.C.*, 50 F.3d at 1314; *In re Dresser*, 972 F.2d at 545 (holding that disqualification of attorney was warranted where attorney had concurrent conflict of interest and presented no reason that "some social interest to be served by his representation would outweigh the public perception of his impropriety")).

[115] Rule 1.10(a) states:

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

### D.  Whether Stow-Serge Should be Disqualified Pursuant to Rule 1.9(a)

Defendant argues that Stow-Serge should be disqualified because he has represented 911 and Eco in previous matters where the companies brought breach of contract and unjust enrichment claims against property owners based on the AOB the owners executed in the companies' favor for their services and the AOBs are substantially similar to the AOB Plaintiff executed in favor of 911.[116] While Defendant has established that Stow-Serge currently represents Eco and has historically represented 911 in numerous matters, it has not established that Stow-Serge currently represents 911. Defendant's argument for disqualification thus requires assessment of Rule 1.9 because 911 must be considered a former client.

Rule 1.9(a) states:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.[117]

This substantial relationship test has two elements: (1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and (2) a substantial relationship between the subject matter of the former and present representations.[118]  The test is "categorical in requiring disqualification once a substantial relationship between past and current representation is established."[119]  The test's purpose is to "ensure that lawyers adhere to their twin duties of loyalty and confidentiality to client, both past and present."[120]

While the first element of the substantial relationship test generally requires an attorney-client relationship between the moving party and the attorney he seeks to disqualify, that requirement is not

---

[116] *See* ECF Nos. 145-3; 145-4; *supra* note 92.

[117] La. Rules of Pro. Conduct r. 1.9.

[118] *United States v. Ryan*, 597 F. Supp. 3d 931, 944 (E.D. La. 2022) (Fallon, J.) (citing *Sempiterno*, 2020 WL 5017667, at *6 (citing *Am. Airlines*, 972 F.3d at 614)).

[119] *Am. Airlines*, 972 F.3d at 614.

[120] *Ryan*, 597 F. Supp. 3d at 944 (citing *Am. Airlines*, 972 F.3d at 614; *Yarn Processing* 530 F.2d at 890); *accord. Zichichi*, 2008 WL 2858232, at *3 (citation omitted).

absolute.[121]   Rather, a moving party that lacks a former-client relationship with the attorney may still seek disqualification pursuant to Rule 1.9 when an exception applies, such as an open and obvious conflict faced with which the court has a duty to act.[122]

The moving party bears the burden of establishing a substantial relationship, which requires the party to "delineate[ ] with specificity the subject matters, issues and causes of action common to prior and current representations."[123]   Then the Court, rather than applying the test "in a 'mechanical' way so as to forever foreclose a lawyer from representing an interest adverse to a former client,"[124] "engages in a painstaking analysis of the facts and precise application of precedent."[125]   "Where conflict of interest or abuse of professional confidence is asserted, the right of an attorney freely to practice his profession must, in the public interest, give way in cases of doubt."[126]

Courts have applied "various glosses" on the substantial relationship test to provide guidance on this fact-intensive inquiry.[127]   The Louisiana Supreme Court has a narrow view, holding that two matters are "'substantially related' when they are so interrelated both in fact and substance that a reasonable person would not be able to disassociate the two."[128]   Courts in this district have noted that the test is less demanding, requiring "common subject matters, issues, and causes of action[ ] but . . . not . . . the same factual scenarios in both cases."[129]   But the Fifth Circuit has recognized an even

---

[121] The first element is based in *Yarn Processing*, so it must be analyzed considering the *Yarn Processing* exceptions. *See Am. Airlines*, 972 F.2d at 614 (quoting *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989) (citing *Corrugated Container*, 659 F.2d at 1345 (citing *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp.*, 559 F.2d 250, 252 (5th Cir. 1977) (citing *Yarn Processing*, 530 F.2d 83)))); *see also Andry*, 2020 WL 5982898, at *11 (equating the first element of the substantial relationship test to a standing requirement in light of *Yarn Processing*).

[122] *See OneBeacon Ins. Co. v. T. Wade Welch Assocs.*, No. 11-3061, 2012 WL 393309, at *4 (S.D. Tex. Feb. 6, 2012) ("Raney's relationship with the Welch firm is an employee-employer relationship, not an attorney-client relationship. Thus, the court would normally need to determine whether one of [*Yarn Processing*'s] 'narrow exceptions' to the rule require the movant to have had an attorney-client relationship exists.").

[123] *Ryan*, 597 F. Supp. 3d at 945 (quoting *Am. Airlines*, 972 F.3d at 614).

[124] *Zichichi*, 2008 WL 2858232, at *3 (quoting *Am. Airlines*, 972 F.3d at 614).

[125] *Am. Airlines*, 972 F.3d at 614 (internal quotations and citation omitted).

[126] *Doe v. A Corp.*, 709 F.2d 1043, 1047 (5th Cir. 1983) (quoting *Chugach Elec. Ass'n v. U.S. Dist. Ct.*, 370 F.2d 441, 444 (9th Cir. 1966)).

[127] *Ryan*, 597 F. Supp. 3d at 945.

[128] *Walker v. State, Dep't of Transp. & Dev.*, 817 So. 2d 57, 62 (La. 2002).

[129] *Parker v. Rowan Cos.*, No. 03-545, 2003 WL 22852218, at *10 (E.D. La. Nov. 25, 2003) (citing cases).

broader definition of "substantial relationship": "two representations need only involve the same 'subject matter' in order to be substantially related."[130]  "The subject matter 'does not need to be 'relevant' in the evidentiary sense to be 'substantially related.'  It need only be akin to the present action in a way reasonable persons would understand as important to the issues involved."[131]  The Fifth Circuit has applied the substantial relationship test "in cases that fall along a continuum, from those in which the linkage is clear to those in which the connection is nebulous and superficial."[132]

A finding of a substantial relationship triggers two irrebuttable presumptions: (1) that relevant confidential information was disclosed during the former period of representation; and (2) that confidences obtained by an individual lawyer will be shared with the other members of his firm.[133]

Defendant cites to a state court matter where Stow-Serge represented 911,[134] and attaches 911's petition against a property owner and his insurer.[135]  That case involved 911's claim that it was contractually owed a portion of the owner's recovery for mitigation services it provided after Hurricane Ida,[136] implicating the AOB between the parties.  In this case, Plaintiff asserts two claims against Defendant,[137] alleging, among other things, that Defendant "grossly under-scoped the

---

[130] *Ryan*, 597 F. Supp. 3d at 945–46 (quoting *Am. Airlines*, 972 F.2d at 625 (citing *Corrugated Container*, 659 F.2d at 1341; *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1020 (5th Cir. Unit B June 1981)); *see also Acad. of Allergy & Asthma in Primary Care v. La. Health Serv. & Indem. Co.*, 384 F. Supp. 3d 644, 655 (E.D. La. 2018) (quoting *Am. Airlines*, 972 F.3d at 625).

[131] *Am. Airlines*, 972 F.3d at 657 (quoting *Corrugated Container*, 659 F.2d at 1346).

[132] *Parker*, 2003 WL 22852218, at *5.

[133] *Patriot Disaster Specialist, LLC v. Travelers Prop. & Cas. Ins. Co.*, No. 23-1687, 2023 WL 11911958, at *2 (E.D. La. Oct. 23, 2023) (Barbier, J.) (quoting *Am. Airlines*, 972 F.2d at 614 & n.1), *reconsideration denied*, 2023 WL 11911959 (E.D. La. Dec. 15, 2023), *appeal dismissed sub nom. Patriot Disaster Specialist, L.L.C. v. Standard Fire Ins. Co.*, No. 24-30024, 2024 WL 3950684 (5th Cir. Aug. 27, 2024).

[134] Defendant also cites to a state court matter involving Eco, but that matter is not relevant for this analysis because Eco is a current, not former, client for purposes of this motion to disqualify.

[135] ECF No. 145-4 at 4-13.  911 alleged the owner retained it for various services for Hurricane Ida damages and that the owner executed in 911's favor an AOB that assigned the insurance proceeds to 911 and obligated him to pay the difference to the extent the proceeds do not equal the value of the services.  *See id.* at 5-6 (¶¶ 7-9, 11-12).  The owner allegedly paid 911 approximately $115,000 for the services; nonetheless, 911 brought claims of breach of contract, unjust enrichment, and conversion against him, alleging the owner received approximately $790,000 from the insurer but has not paid 911 what it is contractually owed.  *See id.* at 8 (¶ 28), 10-12 (¶¶ 41-52).

[136] *See id.* at 10-12 (¶¶ 42, 50, 52).

[137] Plaintiff asserts claims for (1) declaratory relief requiring the parties to participate in the appraisal process and (2) breach of contract and bad faith insurance practices.  *See* ECF No. 1-1 ¶¶ 64-95.

damages" to her property.[138]  She relies on 911's Invoice to support her claim,[139] and Defendant asserts that the 911 Invoice is a sham, created to inflate her claim for damages to obtain more recovery under the policy.  Thus, a critical issue in this case is the amount of actual damages caused by Hurricane Ida, which implicates the validity and amount of 911's Invoice and subjects Plaintiff to potential contractual exposure to 911 under the AOB for amounts not covered by her policy.

Plaintiff argues this matter and 911's previous matters are not substantially related because none involved Plaintiff, her property, or her policy,[140] but the substantial relationship test does not require the factual scenarios to be the same.[141]  Rather, all that is needed is "a common subject matter" between the current and prior representations,[142] and that exists here based on 911's services, the Invoice and the AOB.

Because this matter and the prior 911 matter are substantially related and because the ethical violation is "open and obvious,"[143] Stow-Serge must also be disqualified unless "the former client gives informed consent, confirmed in writing."[144]  Benedict (on behalf of 911) have provided purported waivers.[145]  Regardless, a district court has "broad latitude" in "refusing waivers of conflicts of interest not only in those cases where an actual conflict has been demonstrated before trial, but also in the more common cases where a potential for conflict exists.[146]

---

[138] *Id.* ¶ 78.
[139] ECF No. 159-2 at 11 (Interrogatory No. 15 and Answer).
[140] ECF No. 155 at 10.
[141] *Parker*, 2003 WL 22852218, at *10; *Acad. of Allergy & Asthma*, 384 F. Supp. 3d at 658 ("The Fifth Circuit concluded when finding the System One representation substantially related, that there need not be an exact overlap of the issue of each representation." (citing *Am. Airlines*, 972 F.3d at 623-25)).
[142] *Acad. of Allergy & Asthma*, 384 F. Supp. 3d at 659
[143] *Nagle*, 2015 WL 1525827, at *6 (finding potential Rule 1.9 violation "open and obvious" and thus allowed the court to intervene pursuant to *Yarn Processing*).
[144] LA. RULES OF PRO. CONDUCT r. 1.9(a).
[145] ECF No. 155-3.
[146] *Wheat*, 486 U.S. at 163.

Having found a substantial relationship, the two irrebuttable presumptions are triggered. And Plaintiff's effort to establish informed consent fails. Accordingly, Stow-Serge must be disqualified from this matter.[147]

### E.  Whether Binegar Should be Disqualified Pursuant Rule 3.7

#### 1.  Local Rules, Rule 3.7, and Model Rule 3.7

Defendant argues Binegar is a necessary trial witness for its defenses and counterclaims of breach of contract (specifically, the cooperation clause of the "Duties After Loss" provision and the "Concealment or Fraud" provision of the policy)[148] and fraud under Article 1953 of the Louisiana Code of Civil Procedure.[149]  Rule 3.7 states in pertinent part:

> (a)  A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
> (1)  The testimony relates to an uncontested issue;
> (2)  The testimony relates to the nature and value of legal services rendered in the case; or
> (3)  Disqualification of the lawyer would work substantial hardship on the client.[150]

"The Rule serves two distinct purposes: protecting the client and protecting the integrity of the court proceeding."[151]  It protects the client from a potential conflict of interest which would occur

---

[147] *Acad. of Allergy & Asthma*, 384 F. Supp. at 659-60.
[148] The provisions state in pertinent part:
> **C. Duties After Loss**
> In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either: . . .
> 5. Cooperate with us in the investigation of a claim . . . .
> **R. Concealment Or Fraud**
> We provide coverage to no 'insureds' under this policy if, whether before or after a loss, an 'insured' has:
> 1. Intentionally concealed or misrepresented any material fact or circumstance;
> 2. Engaged in fraudulent conduct; or
> 3. Made false statements; relating to this insurance.
 ECF 46-6 at 49,52.
[149] "Fraud under Louisiana law entails a 'misrepresentation or suppression of the truth made with the intention to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.'" *First Am. Bankcard, Inc v. Smart Bus. Tech., Inc.*, 178 F. Supp. 3d 390, 401 (E.D. La. 2016) (Englehardt, J.) (quoting LA. CIV. CODE art. 1953).
[150] LA. RULES OF PRO. CONDUCT r. 3.7.
[151] *Spotted Cat, LLC v. Bass*, No. 13-6100, 2014 WL 4072024, at *3 (E.D. La. Aug. 18, 2014) (Milazzo, J.) (citing *F.D.I.C.*, 50 F.3d at 1315).

when an attorney is forced to offer testimony that materially differs from the testimony offered by his client.[152]  Rule 3.7 protects the integrity of judicial proceedings as well, because "when an attorney is placed in both positions the Court runs the risk that a jury will assign too much, or possibly too little, weight to the lawyer's testimony."[153]  Because its application is explicitly "limited to those circumstances where the lawyer is likely to be a necessary witness at a trial," Rule 3.7, as well as Model Rule 3.7, "does not apply to pretrial proceedings."[154]  "A necessary witness is one whose testimony is relevant, material, and unobtainable elsewhere."[155]

Testimony is relevant under Rule 401 of the Federal Rules of Evidence if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action.[156]  "[A]ny tendency" indicates the Rule sets a low bar.[157]  For a fact to be "of consequence," under the substantive law of the case, the "proposition to be proved must be . . . probative of a matter that is in issue."[158]

The elements of a fraud claim are: "(1) misstatement or omission; (2) of material fact; (3) made with the intent to defraud; (4) on which [the claimant] relied; and (5) which proximately cause the [claimant's] injury."[159]  An insurance contract's cooperation clause "fulfill[s] the reasonable purpose of enabling the enabling the insurer to obtain relevant information concerning the loss while

---

[152] *Id.* (citing MODEL RULES OF PRO. CONDUCT r. 3.7 cmt. 6 (2011)).

[153] *Id.* (citing cases); *see also* MODEL RULES OF PRO. CONDUCT r. 3.7 cmt. 3.

[154] *CEF Funding*, 2010 WL 2773116, at *2 (citing cases).

[155] *Treece*, 559 F. Supp. 3d at 536 (quoting *Painter v. Suire*, No. 12-511, 2014 WL 3858510, at *2 (M.D. La. Aug. 5, 2014)); *accord. Spotted Cat*, 2014 WL 4072024, at *3 (quoting *CEF Funding*, 2010 WL 2773116, at *2 n.15); *see also United States v. Starnes*, 157 F. App'x 687, 693-94 (5th Cir. 2005) ("A lawyer is not 'likely to be a necessary witness' when evidence pertaining to each matter to which he could testify is available from another source." (citing *Horaist*, 255 F.3d at 267)).

[156] *Treece*, 559 F. Supp. 3d at 536 (citing FED. R. EVID. 401).

[157] *Echeverry v. Jazz Casino Co.,* 988 F.3d 221, 235 (5th Cir. 2021).

[158] *Treece*, 559 F. Supp. 3d at 536 (quoting *United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981)).

[159] *First Am. Bankcard*, F. Supp. 3d at 401 (quoting *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997)).

the information is fresh"; if the insured breaches a cooperation clause to the prejudice of the insurer, dismissal is proper because compliance with policy provisions are conditions precedent to recover.[160] Defendant plans to call Binegar to testify regarding his February 27, 2022, letter submitting the Estimate described as for "storm-related repairs"[161] to establish a misstatement, as well as to testify regarding the failure to inform Defendant of the demolition since his December 1, 2021, letter of representation[162] demands that all contact be through B&C.  The fact that Binegar described the Estimate as "for storm-related repairs" when there is contradictory evidence that he was privy to[163] and did not inform Defendant of the demolition is probative of whether Plaintiff, via her counsel, made a misstatement to the insurer and whether she violated the policy.  Thus, the proposed testimony is relevant.

"Evidence is 'material' if it has 'some logical connection with the consequential facts' or if it is '[o]f such a nature that knowledge of it would affect a person's decision making.'"[164]  The proposed testimony, coming from Plaintiff's point of contact, could have an impact on the jury, and is connected to the issues of whether Plaintiff sought to inflate any storm damages to finance a planned renovation and whether she and/or her counsel cooperated with Defendant in the investigation of her claim, thus it is material.

Testimony is not "unobtainable from elsewhere" when the testimony is available from another source.[165]  Plaintiff argues that Binegar's testimony regarding his February 27, 2022, letter would be

---

[160] *Johnson v. Geovera Ins. Co.*, No. 14-2320, 2015 WL 5083625, at *3 (E.D. LA. Aug. 27, 2015) (Milazzo, J.) (quoting *Hamilton v. State Farm Fire & Cas. Ins. Co.*, 477 F. App'x 162, 163 (5th Cir. 2012); and citing *Lee v. United Fire & Cas. Co.*, 607 So. 2d 685, 688 (La. App. 4th Cir. 1992)), *aff'd sub nom. Johnson v. Geovera Specialty Ins. Co.*, 657 F. App'x 301 (5th Cir. 2016).
[161] ECF 46-12.
[162] ECF No. 145-8.
[163] *See* ECF No. 46-16 at 25 (Fleiner's February 10, 2022, email to Plaintiff indicating that TGC specializes in building/renovating homes, not storm damages, and that the estimate is for rebuilding Plaintiff's property into a single-family home, and Plaintiff's February 11, 2022, response requesting a TGC estimate for one of her properties and cc'ing Binegar)
[164] *Treece*, 559 F. Supp. 3d at 537 (*Material*, BLACK'S LAW DICTIONARY (11th ed. 2019)).
[165] *Horaist*, 255 F.3d at 267.

cumulative because Fleiner and her expert can testify as to why the Estimate's items were related to storm-related repairs.[166]   Regardless, neither of them can testify about Binegar's "storm-related repairs" statement and Binegar's motivations for describing the Estimate as such because neither has any personal knowledge about the letter.[167]   And even if the recipient of the letter Ray Cheeks, then an employee of Minuteman, could testify to the letter's contents, that testimony would not be wholly cumulative because Cheeks cannot testify as to Binegar's motivation for describing the estimate as he did.[168]   There is no other source that can testify as to that statement and the motivation for making it except Binegar.   Further, while the letter of representation indicates all communication regarding Plaintiff's claim should go through B&C rather than just Binegar, potentially making Christian a source, her testimony is not "available."   To find otherwise would effectively create a vicious cycle where Christian could point to Binegar as another source and Binegar could point to Christian as the other "source."   For that reason, Binegar is effectively the only available source to testify as to why Defendant was not informed about the demolition.   Thus, Binegar is a necessary witness.

### 2.   Substantial Hardship vs. Appearance of Impropriety

The Court must next consider whether the substantial hardship to Plaintiff outweighs the appearance of impropriety and other policy considerations.[169]   Model Rule 3.7 provides guidance in assessing whether the substantial hardship exception applies:

> [The substantial hardship exception] recognizes that a balancing is required between the interests of the client and those of the tribunal and the opposing party. Whether the tribunal is likely to be misled or the opposing party is likely to suffer prejudice depends

---

[166] ECF No. 155 at 19-20.

[167] *See United States v. El-Mezain*, 664 F.3d 467, 495 (5th Cir. 467, 495) ("A witness's testimony must be based on personal knowledge. [This] requirement and the hearsay rule 'are cut at least in part from the same cloth,' as Rule 602 prevents a witness from testifying about a hearsay statement upon which he has no personal knowledge." (citations omitted)).

[168] *Cf. SAS Overseas Consultants v. Offshore Consultants USA, Ltd.*, No. 97-3449, 1998 WL 676992, at *3 (E.D. La. Sept. 30, 1998) (Vance, J.) (finding client's testimony regarding meeting with counsel about the drafting and negotiating of a contract not wholly cumulative of what counsel's testimony would be because it was "highly unlikely" client and counsel would have an "identical understanding of the agreement or remember all of the same details as to the drafting, revisions, and communications regarding the contract").

[169] *Horaist*, 255 F.3d at 267 n.5

on the nature of the case, the importance and probably tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with that of other witnesses. Even if there is risk of such prejudice, in determining whether the lawyer should be disqualified, due regard must be given to the effect of disqualification on the lawyer's client. It is relevant that one or both parties could reasonably foresee that the lawyer would probably be a witness.[170]

Further, "[u]nless an impermissible conflict of interest exists between a testifying lawyer and [his] client, Model Rule 3.7 . . . does not mandate vicarious disqualification of the lawyer's firm."[171] "An impermissible conflict exists where there is a high likelihood that at attorney's testimony will be prejudicial to his client and an attorney's own conduct [and motivations are] at issue thereby making it impossible" for counsel to provide arm's length counsel.[172] Conversely, a "remote possibility" that counsel's testimony will be adverse to the client is insufficient for a finding of an impermissible conflict.[173] This court has found impermissible conflicts where counsel's testimony "could undermine or even defeat" the client's claims.[174] And the consequence of an impermissible conflict is the disqualification of counsel and the firm from the matter entirely.[175]

Considering the substantial hardship factors, the substantial hardship to Plaintiff does not outweigh the appearance of impropriety and other policy considerations. Both parties could reasonably foresee that Binegar would probably be a witness as he has been on Defendant's Witness List for seven months.[176] And Binegar's testimony is highly important to Defendant's defenses and

---

[170] *Treece*, 559 F. Supp. 3d at 539 (brackets in original) (quoting MODEL RULES OF PRO. CONDUCT r. 3.7 cmt. 4)

[171] *F.D.I.C.*, 50 F.3d at 1313.

[172] *AMEC Constr. Mgmt., Inc. v. FFIC Risk Mgmt.*, No. 13-718, 2017 WL 3602053, at *4 (M.D. La. Aug. 22, 2017) (citation omitted); *accord. Bellino v. Simon*, No. 99-2208, 1999 WL 1277535, at *3 (E.D. La. Dec. 28, 1999) (Vance, J.) (citing *Lange*, 1997 WL 668216, at *3; *Guar. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 90-2695, 1993 WL 165690, at *8 (E.D. La. 1993))

[173] *AMEC Constr. Mgmt.*, 2017 WL 3602053, at *4 (quoting *F.D.I.C.*, 50 F.3d at 1314).

[174] *See Bellino*, 1999 WL 1277535, at *4; *accord. Lange*, 1997 WL 570689, at *3 (disqualifying counsel because he was a necessary witness as to whether an event that is a basis of the client's racial discrimination claim was "staged"); *Lange*, 1997 WL 668216, at *4-5 (finding an impermissible conflict due to the testimony intended to be elicited from counsel regarding the event).

[175] *Bellino*, 1999 WL 1277535, at *5; *Lange*, 1997 WL 667216, at *5.

[176] *See Treece*, 559 F. Supp. 3d at 539 ("It also is relevant that both parties 'could reasonably foresee that [counsel] would probably be a witness' when she enrolled as counsel because she had been listed as a witness for [Defendant] for eighteen months prior." (alterations in original) (citation omitted)).

counterclaims. Further, as to testimony regarding the Estimate, the probability of conflicting testimony between Binegar and Plaintiff is high. Plaintiff likely will testify that the Estimate was for storm-related repairs.[177] While Binegar likely will testify same given his argument in Plaintiff's Opposition memorandum,[178] Defendant intends to elicit the opposite based on the pre-submission February email chain.[179] In that situation, Plaintiff "would likely be in the confusing position of having to impeach [her] own lawyer," and even if she does not, Binegar's testimony would nevertheless conflict with hers, thus it "has great potential to both confuse the jury and prejudice" her.[180]

However, the disqualification could have a prejudicial effect on Plaintiff. Binegar has spent years on this matter, and the trial is set to begin soon. Generally, this prejudice is mitigated by the party having counsel familiar with the matter available[181] and/or the disqualification being limited to participation at trial, allowing for counsel to assist new counsel in preparation of thereof and to participate in pretrial proceedings.[182] Without such, the client must face "hiring new counsel from a

---

[177] *See* ECF No. 46-9 at 246:14-247:22 (agreeing with "everything" in Binegar's submission letter).

[178] *See* ECF No. 155 at 19-20 (arguing the estimate covers damages causes by Hurricane Ida).

[179] *See supra* note 163.

[180] *Treece*, 559 F. Supp. 3d at 540.

[181] *See id.* ("[Plaintiffs] still are represented by their longtime attorney [], who has been practicing for sixteen years . . . [and] has adequately represented [Plaintiffs] since the beginning."); *F.D.I.C.*, 50 F.3d at 1317 ("Whereas disqualification of the entire [] firm would be a penalty disproportionate to the potential harm at issue, the disqualification of one or two attorneys would not work such a substantial hardship on the [client] that their cause would be unfairly injured."); *SAS Overseas*, 1998 WL 676992, at *3 (finding no substantial hardship in disqualifying counsel because, among other things, "other members of [counsel's firm] appeared familiar with the case and prepared to take it to trial."); *U.S. Fid. & Guar. Co. v. Peoples Bank*, No. 08-242, 2012 WL 1099762, at *14 (S.D. Miss. Apr. 2, 2012) (analyzing identical substantial hardship exception to Mississippi's lawyer-witness rule and finding no substantial hardship to client because "disqualification of one of five lawyer retained by [client] would [not] work 'substantial hardship'").

[182] *See Treece*, 559 F. Supp. 3d at 540 ("[D]isqualification affects only the attorney's role *at trial*; the disqualified attorney may still consult with other counsel, assist with trial preparation, prepare documents, research legal issues, handle pretrial negotiations, speak at settlement conference, and appear at certain pretrial hearings. [Counsel] will be able to use her experience . . . in preparing for trial. Thus, there is not substantial hardship.") (emphasis in original).

different law firm who is unfamiliar with this case" when trial is to begin soon.[183]  New counsel would not have the opportunity of participating in discovery.[184]

Regardless, there is a high likelihood that Binegar's testimony will be prejudicial to Plaintiff, and thus, he and B&C must be disqualified from this matter entirely for this reason too.  His conduct and motivations are at issue because Defendant has indicated that it plans to call him to testify about why he described the Estimate as he did when Fleiner specified that the Estimate was not for storm repairs and why he did not inform Defendant of the demolition when there is evidence that suggests he knew it would occur.[185]  Such testimony likely undermines, if not defeats, Plaintiff's claims against Defendant given it has asserted fraud and breach of contract defenses based on Binegar's statement,[186] and the testimony will be used for Defendant's counterclaims,[187] making it adverse to Plaintiff.  Plaintiff argues that the Estimate is for storm-related repairs because the "items in the [Estimate] were caused" by Hurricane Ida.[188]  But certainty that Binegar's testimony will be prejudicial is not required, only a high likelihood, which exists based on the evidence in the record.

Thus, Binegar and B&C must be disqualified from the matter entirely for the separate reason that there is a high likelihood that Binegar's testimony will be prejudicial to Plaintiff and his conduct and motivations are at issue.  Consequently, to mitigate the substantial hardship Plaintiff would face moving forward without any counsel familiar with this matter and trial to begin soon, The Court will

---

[183] *McNeil v. Sullivan*, No. 17-481, 2020 WL 7342397, at *4 (M.D. La. Dec. 14, 2020).

[184] *See Matthew v. Stolier*, No. 13-6638, at *3 (E.D. La. Dec. 23, 2015) (Milazzo, J.) (noting that "discovery has only just begun" as a factor in finding no substantial hardship); *Lange*, 1997 WL 668216, at *4 (finding any substantial hardship outweighed because "discovery is in the very early stages, if indeed it has commenced at all").

[185] ECF No. 46-14 (November 28, 2021, email from Diez to Plaintiff and Binegar that states Diez would speak with Binegar about "next steps" about the mitigation process and that the process "should be set begin" after the initial inspection).

[186] ECF No. 84 at 2-3 (Thirtieth Defense).

[187] *See id.* at 9-10 (¶¶ 14-17).

[188] ECF No. 155 at 19.

continue the trial date to allow Plaintiff to obtain new counsel and that counsel to become familiar with the matter.[189]

## III.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Defendant's Motion to Disqualify Counsel is GRANTED.

IT IS FURTHER ORDERED that the trial beginning Monday, April 21, 2025, is CONTINUED.  The Court's case manager will conduct a scheduling conference to select new trial and pretrial conference dates and re-open discovery to the extent necessary to alleviate any prejudice from the need to enroll new counsel.

IT IS FURTHER ORDERED Plaintiff must enroll new counsel within 30 days of this Order and Reasons.

New Orleans, Louisiana, this ___15th___ day of April, 2025.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE

---

[189] *See Clark v. R.D. Werner Co.*, No. 99-1426, 2000 WL 64302, at *2-3 (E.D. La. Jan. 26, 2000) (Clement, J.) (continuing the "upcoming trial date" because party's only counsel must be disqualified from representing the party "at any stage" of the proceedings  for being a necessary witness and to allow substituting counsel to become familiar with the party's claims).